**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| **[SEALED]** ) | |
| ) | |
| **Plaintiff/Relator** ) | Civil Action No.   4:22cv133-SDJ |
| ) | |
| ) | |
| **vs.** ) | |
| ) | |
| ) | |
| **[SEALED]** ) | **FILED UNDER SEAL AS REQUIRED** |
| ) | **BY 31 U.S.C. § 3730(b)(2)** |
| **Defendants.** ) | |
| ) | **DO NOT PUT IN PRESS BOX** |
| ) | **DO NOT PUT ON PACER** |
| ) | |
| ) | **JURY TRIAL REQUESTED** |
| ) | |

**COMPLAINT**
**FOR VIOLATIONS OF THE FALSE CLAIMS ACT,**
**31 U.S.C. §§ 3729 *et seq.***

i

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| United States of America *ex rel.* Robert P. Oristaglio, Jr., D.O., ) ) ) | Civil Action No. |
| Plaintiff/Relator, ) ) ) | |
| vs. ) ) | **FILED BY HAND** |
| Community Care Health Network, Inc., d/b/a/ Matrix Medical Network; Frazier Healthcare Partners; ModivCare, Inc. f/k/a Providence Service Corporation; DPN USA, LLC d/b/a HealthFair; Shahriar "James" Ekbatani, Individually; and their Successors and Assigns, ) ) ) ) ) ) ) | **FILED UNDER SEAL AS REQUIRED BY 31 U.S.C. § 3730(b)(2)** **DO NOT PUT IN PRESS BOX DO NOT PUT ON PACER** |
| Defendants. ) ) ) | **JURY TRIAL REQUESTED** |

COMPLAINT
FOR VIOLATIONS OF THE FALSE CLAIMS ACT,
31 U.S.C. §§ 3729 *et seq.*

ii

## TABLE OF CONTENTS

I.    NATURE OF ACTION .................................................................................................. 1

II.   JURISDICTION AND VENUE ................................................................................... 4

III.  PERFECTION OF FILING AND STANDING TO REPRESENT THE
      GOVERNMENT ......................................................................................................... 4

IV.   PARTIES ..................................................................................................................... 5

   A.    Plaintiff/Relator ................................................................................................... 5

   B.    Defendants ........................................................................................................... 6

V.    APPLICABLE LAWS ............................................................................................... 9

   A.    The False Claims Act .......................................................................................... 9

   B.    Medicare ............................................................................................................ 14

      1.    Generally .................................................................................................... 14

      2.    Provider Certifications .............................................................................. 15

      3.    Medicare Billing Procedures and Coding Terminology ........................... 18

      4.    Medicare Part B ......................................................................................... 19

      5.    Medicare Part C (a/k/a Medicare Advantage) and the Risk Adjustment Model ............ 20

   C.    Laws Prohibiting Inducements to Beneficiaries or Providers ........................... 22

      1.    Beneficiary Inducements Statute ............................................................... 22

      2.    Anti-Kickback Statute ............................................................................... 23

      3.    The Stark Law ........................................................................................... 25

VI.   DEFENDANTS' MISCONDUCT ............................................................................ 27

   A.    HealthFair's Early Years .................................................................................... 27

   B.    DPN/HealthFair's Middle Years: Hospital Contracts and Corporate Events ..................... 29

   C.    DPN/HealthFair's Shift into Medicare Advantage Fraud .................................. 32

   D.    Defendants Retaliated against Dr. Oristaglio and Constructively Discharged Him for
         Raising Concerns about Fraud and Poor Patient Care ...................................... 45

COUNT I - False Claims Act 31 U.S.C. § 3729(a)(l)(A) ............................................... 47

COUNT II - False Claims Act 31 U.S.C. § 3729(a)(1)(B) .............................................. 48

COUNT III - False Claims Act 31 U.S.C. § 3729(a)(1)(G) ............................................ 49

COUNT IV - False Claims Act 31 U.S.C. § 3729(a)(1)(C) ............................................ 49

COUNT V - False Claims Act 31 U.S.C. § 3730(h) (Retaliation) ................................... 49

PRAYER FOR RELIEF ................................................................................................... 50

REQUEST FOR TRIAL BY JURY ................................................................................. 51

## I.　　NATURE OF ACTION

1.　　Robert P. Oristaglio, Jr., D.O. ("Dr. Oristaglio"), as Relator, brings this *qui tam* action under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*. ("FCA"), on behalf of himself and on behalf of the United States to recover civil penalties and treble damages. Dr. Oristaglio, as Plaintiff, also brings personal claims under 31 U.S.C. § 3730(h) for retaliation.

2.　　Defendant Shahriar "James" Ekbatani founded the original HealthFair company in about 1999 for the purpose of providing screening tests direct to consumers using a mobile lab. In about 2000, Dr. Oristaglio joined HealthFair as its Medical Director, and James Ekbatani considered him to be one of the company's founders. Dr. Oristaglio remained committed to HealthFair's mission of providing patients with early detection of cardiovascular disease ("CVD") and other conditions until 2018, a tenure that included various ownership changes.

3.　　Unbeknown to Dr. Oristaglio at the time, Defendant James Ekbatani founded the original HealthFair entity while out on bond after being arrested and arraigned, on March 10, 1999, pursuant to a grand jury indictment filed on March 5, 1999, arising from his receipt of kickbacks for the referral of home healthcare services covered by Medicare. *See United States v. Abdullah, M.D., et al.*, No. 2:99-cr-14015-DMM, Doc. 5 Indictment, at Counts 4, 22, and 23 (S.D. Fla. Mar. 5, 1999); *see id.*, Doc. 39 Arraignment (filed Mar. 12, 1999).

4.　　Defendant Ekbatani eventually pled guilty to Medicare fraud, was sentenced to 15 months, and was remanded into custody and delivered to federal prison on May 15, 2001. Assuming he served the full 15-month sentence, James Ekbatani would have been released from prison on about August 15, 2002.

5.　　As a result of his guilty plea and sentence, the Center for Medicare & Medicaid Services ("CMS") excluded James Ekbatani from all government healthcare programs for a period in excess of ten years, effective September 19, 2002[1] through March 31, 2013.

---

[1] https://www.federalregister.gov/documents/2002/09/11/02-23033/program-exclusions-august-2002 (last accessed Feb. 25, 2022).

6.      At no time did James Ekbatani ever disclose to Dr. Oristaglio that he had been indicted for and had pled guilty to committing Medicare fraud, that he had served time in federal prison for Medicare fraud, or that he was excluded from government healthcare programs for over ten years after his release from prison.

7.      In fact, Dr. Oristaglio only learned of Ekbatani's guilty plea and sentence in the course of other litigation that occurred after he was constructively discharged from Matrix and by extension, from the former company HealthFair and its DPN subsidiaries.

8.      Returning to the chronology, in 2006 James Ekbatani sold the original HealthFair company, although Dr. Oristaglio continued to guide its mission as the Medical Director. Later, in 2009, James Ekbatani formed Defendant DPN USA, LLC ("DPN") to repurchase HealthFair. Dr. Oristaglio again provided continuity as the Medical Director.

9.      In about mid-2014 (i.e., about one year after expiration of James Ekbatani's CMS exclusion), James Ekbatani began orchestrating the scheme alleged herein concerning Medicare Advantage ("MA") risk adjustment fraud.

10.     At all relevant times, from 2014 through February 2018, James Ekbatani was DPN's Chief Executive Officer, personally owned 77% of the DPN stock, and controlled as trustee another 20% of the stock (10% Nobility Trust for the benefit of his son Ray Ekbatani, 10% Dignity Trust for the benefit of his son Shawn Ekbatani). Both of his sons worked at DPN, with Ray being in charge of sales and marketing, and Shawn being in charge of Information Technology (including the software platforms for patient records and billing).

11.     Beginning in 2014, James Ekbatani used Relator and other physicians to set up sham professional corporations, all with the name "HealthFair Plus." These professional corporations were set up in eight different states and then cross-registered in multiple states (i.e., the California entity was registered and doing business in 27 states). The physicians were not given any evidence of ownership. The physicians were also not provided with any business or financial information concerning the entities and, therefore, had no knowledge that James Ekbatani and DPN used the

2

entities to perpetrate fraud.

12.    DPN "managed" these sham professional corporations, but, in reality, James Ekbatani admittedly used them to conceal his criminal history and resulting CMS exclusion to induce MA plans to enter into contracts for lab screening services DPN performed doing business as HealthFair. All of the revenue from these professional corporations were siphoned over to DPN via "management fees."

13.    MA pays health plans a capitated per-member, per-month sum to assume the risk of providing healthcare to the enrolled beneficiary. The capitation rate for each enrollee is determined by the enrollee's annually updated risk score, which is derived from certain relevant diagnoses. As a result, "[t]he United States relies on healthcare providers to submit accurate diagnosis data to Medicare Advantage plans to ensure those plans receive the appropriate compensation from Medicare."[2]

14.    In the present case, Defendant Ekbatani orchestrated a scheme to increase MA patients' risk scores through unsupported diagnoses. To facilitate this scheme, Defendants:

a)  induced patients to use DPN/HealthFair for their annual MA wellness or physical visit through the routine offer of a $40 gift card to CVS pharmacy or other retailers;

b)  created a process that gave nurse practitioners at mobile clinics the ability to order tests without substantiating medical necessity, which process included standing orders with Dr. Oristaglio's forged and unauthorized signature;

c)  usurped the professional judgment of physicians hired to interpret the tests, including allowing nurse practitioners to override the physician's interpretation, and by using computer-generated test results without considering other relevant

---

[2] U.S. Department of Justice, *Medicare Advantage Provider and Physician to Pay $5 Million to Settle False Claims Act Allegations*, (Aug. 8, 2019), https://www.justice.gov/opa/pr/medicare-advantage-provider-and-physician-pay-5-million-settle-false-claims-act-allegations (last accessed Feb. 25, 2022).

factors necessary for a proper diagnosis; and

d) concealed the scheme from Dr. Oristaglio and other physicians who were contracted to interpret test results, in part by denying the contracted physicians full access to patients' electronic health record ("EHR").

15. This scheme continued after the Matrix defendants acquired the assets of DPN, including the HealthFair Plus entities, in February 2018.

16. As a result of this scheme, Defendants made, used, or caused to be made or used false records and/or statements material to claims submitted to MA plans, including, without limitation, false and medically unsupported diagnoses relevant to patient risk scores and the capitation rate paid by Medicare.

17. Furthermore, as a result of this scheme, Defendants submitted, or caused to be submitted, false or fraudulent claims for payment to MA plans and subsequently knowingly retained the overpayments.

## II.    JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a) because the causes of action arise under a federal statute. The causes of action brought on behalf of the United States seek recovery of funds the Government expended.

19. This Court has personal jurisdiction over Defendant, and venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c), because Defendant can be found, resides, transacts substantial business, and committed acts proscribed by 31 U.S.C. § 3729 within this District.

## III.    PERFECTION OF FILING AND STANDING TO REPRESENT THE GOVERNMENT

20. Relator brings this action on behalf of the United States pursuant to the FCA's *qui tam* provision, 31 U.S.C. § 3730(b).

21. This complaint was properly filed in camera and under seal, as required by 31 U.S.C.

§ 3730(b)(2), and will remain under seal for at least 60 days as required by the FCA. Pursuant to 31 U.S.C. § 3730(b)(2), the Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the evidence submitted to it or while the case otherwise remains under seal. Pursuant to 31 U.S.C. § 3730(c)(3), upon a showing of good cause, the Government may also intervene after the case is unsealed and while Relator is prosecuting the case.

22.    Prior the filing of and service of this Complaint, Relator properly served a copy of the written disclosure of substantially all material evidence and information upon the Government, as required by 31 U.S.C. § 3730(e)(4)(B).

23.    Relator is not aware of any "public disclosure," as that term is used in the FCA, 31 U.S.C. § 3730(e)(4)(A), of the allegations forming the core elements of the Counts against Defendants.

24.    In the event there is found to be any such public disclosure, Relator alleges that he qualifies as an "original source," as that term is used in the FCA, 31 U.S.C. § 3730(e)(4)(B), of the allegations or transactions forming the core elements of the Counts against Defendants.

25.    In particular, and consistent with the meaning of "original source" under the FCA, Relator either "voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based" prior to any public disclosure under subsection (e)(4)(A) or has "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions and voluntarily provided the information to the Government before filing" this action. 31 U.S.C. § 3730(e)(4)(B).

## IV.    PARTIES
### A.    Plaintiff/Relator

26.    Robert P. Oristaglio, Jr., D.O. is a resident of Palm Beach County, Florida. Dr. Oristaglio earned a Bachelor's Degree from the University of Pennsylvania in 1972 and subsequently earned a Doctorate of Osteopathic Medicine from the Philadelphia College of

Osteopathic Medicine in 1976. He is board-certified in internal medicine, a registered vascular interpreter, and an Accredited Medical Director per the Intersocietal Commission for the Accreditation of Echocardiography Laboratories and the Intersocietal Commission for the Accreditation of Vascular Laboratories. From October 2000 until February 2018, Dr. Oristaglio was affiliated with DPN d/b/a HealthFair, and its successor Matrix, in various capacities.

**B.    Defendants**

27.    Community Care Health Network, Inc. ("CCHN") d/b/a Matrix Medical Network ("Matrix") is a Delaware corporation formed on February 2, 2010. CCHN maintains its headquarters at 9201 East Mountain View Road, Suite 220, Scottsdale, Arizona 85258. The authorized official is listed as John Hopkins, the General Counsel/Chief Compliance Officer, whose phone number is (480) 862-1701.[3] Matrix's National Provider Identification ("NPI")[4] is 1619368842, with Taxonomy Code 363L00000X, and classification "nurse practitioner" type "Physician Assistants & Advanced Practice Nursing Providers."[5] Matrix is approved as a lab to perform waived tests, and holds CLIA[6] number 03D2157113.[7] In February 2018, CCHN acquired DPN USA, LLC d/b/a HealthFair and its subsidiaries[8] in a deal that involved private equity financing from Defendants Frazier Healthcare Partners and Providence Service Corporation.

28.    Frazier Healthcare Partners ("Frazier") is a private equity firm with its principal place of business at Two Union Square, 601 Union Street, Suite 3200, Seattle, Washington 98101.[9] In August 2016, Frazier completed a subscription agreement with Defendant Providence Service

---

[3] *See* www.matrixmedicalnetwork.com (last visited Feb. 25, 2022).

[4] "The National Provider Identifier (NPI) is a Health Insurance Portability and Accountability Act (HIPAA) Administrative Simplification Standard. The NPI is a unique identification number for covered health care providers. Covered health care providers and all health plans and health care clearinghouses must use the NPIs in the administrative and financial transactions adopted under HIPAA. The NPI is a 10-position, intelligence-free numeric identifier (10-digit number)." *See* https://www.cms.gov/Regulations-and-Guidance/Administrative-Simplification/NationalProvIdentStand (last visited Feb. 25, 2022).

[5] *See* https://npiprofile.com/npi/1619368842 (last visited Feb. 25, 2022).

[6] CLIA stands for Clinical Laboratory Improvement Amendments of 1988.

[7] *See* https://npiprofile.com/npi/1619368842 (last visited Feb. 25, 2022).

[8] SPA-5.01-5.05aii.pdf (complete list of DPN subsidiaries by state). Ex. A.

[9] www.frazierhealthcare.com

6

Corporation to own a 53% equity interest in Matrix. As indicated in a *Modern Healthcare* article, Frazier was supposed to acquire a 60% ownership in Matrix and pay $418 million for a valuation of Matrix of $537.5 million with "[t]he goal is to get a sense of a patient's health status, which insurers then code to get a risk-adjusted score. If someone has a higher risk score, indicating they are sicker, insurers receive higher payments."[10] These types of in-home risk assessments are frequently used by Medicare Advantage insurers.[11] From 2016 onward, Frazier worked with Matrix's management team, which was initially led by CEO Walt Cooper, to further the business' goals. Frazier general partners Ben Magnano and Brian Morfitt secured seats as directors and Frazier operating partner, Brett Moraski, obtained a seat on the Matrix Medical board.[12] In February 2018, Matrix acquired Defendant DPN USA, LLC. Prior to the deal, Frazier conducted due diligence of DPN USA, LLC's business affairs, became aware of its business model, and continued the business model after the acquisition. Relator has named the private equity group Frazier as a defendant because it was complicit and had ownership and control of Matrix and HealthFair.

29. ModivCare, Inc. f/k/a Providence Service Corporation ("Providence") is a publicly traded (NASDAQ: MODV f/k/a NASDAQ: PRSC) holding company with its principal place of business at 1275 Peachtree Street, NE, Atlanta, Georgia 30309.[13] In August 2016, Providence entered a strategic partnership with Frazier. Initially, Frazier was to own 60% of Matrix; however, on Oct. 27, 2016, it was announced that Providence would retain a 47% interest and Frazier would

---

[10] B. Herman, *Private-equity firm buys majority stake in Matrix risk-coding* (Aug. 29, 2016), https://www.modernhealthcare.com/article/20160829/NEWS/160829924/private-equity-firm-buys-majority-stake-in-matrix-risk-coding-firm.

[11] *Ibid.*

[12] I. Regmi, *Frazier Healthcare acquires 53% of Matrix Medical Network, S&P Global Market Intelligence* (Oct. 27, 2016), https://www.spglobal.com/marketintelligence/en/news-insights/trending/lksl3_gfsiebgnmpzez1la2.

[13] *See* www.prscholdings.com (last visited Feb. 25, 2022). *See also* https://www.globenewswire.com/news-release/2021/01/06/2153997/0/en/Providence-Announces-New-Name-ModivCare.html (Feb. 25, 2022).

hold 53%[14] ownership of Matrix. In February 2018, Matrix acquired Defendant DPN USA, LLC, which it initially explained to shareholders as follows:

> On February 16, 2018, Matrix acquired HealthFair, a leading provider of mobile health assessment and advanced diagnostic testing services for a purchase price of $160,000 plus an earnout payment contingent upon HealthFair's 2018 financial performance.[15] Additionally, Matrix entered into a financing transaction consisting of a $330,000 first lien term loan and a $20,000 revolving line of credit, of which none was drawn, and issued an aggregate of approximately 24,200,000 shares of its common units related to a seller roll-over contribution. As a result of the rollover of certain equity interests in HealthFair, Providence's equity ownership is 43.6% as of February 16, 2018.[16]

Prior to the deal, Providence conducted due diligence of DPN USA, LLC's business affairs, became aware of its business model, and continued the business model after the acquisition. Relator has named the private equity group ModivCare f/k/a Providence as a defendant because it was complicit and had ownership and control of Matrix and HealthFair.

30. DPN USA, LLC d/b/a HealthFair ("DPN/HealthFair") is a Florida limited liability company formed on September 11, 2009. Prior to February 2018, its principal place of business was at 1030 Spring Villas Point, Suite 3000, Winter Park, Florida 32708.[17] It was acquired on February 16, 2018, by Matrix, and now maintains its principal address at the Matrix headquarters: 9201 East Mountain View Road, Suite 220, Scottsdale, Arizona 85258. According to the Florida Division of Corporations, DPN USA, LLC remains in active status in Florida[18] and lists as its

---

[14] *Supra* n. 12.

[15] DPN USA, LLC has filed an action against Matrix alleging that it improperly depressed HealthFair's 2018 earnings in order to reduce or avoid this earnout payment. *See* Case No. 2019-CA-000999-15-K in the Circuit Court of the Eighteenth Judicial Circuit, in and for Seminole County, Florida.

[16] *See* https://www.sec.gov/Archives/edgar/data/1220754/000122075418000026/prsc-12312017x10k.htm, p. 121. (last accessed Feb. 23, 2022).

[17] *See* www.healthfair.com (last visited Oct. 1, 2019); available now at https://web.archive.org/web/*/www.healthfair.com*.

[18] *See* https://search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail?inquirytype=EntityNam e&directionType=Initial&searchNameOrder=DPNUSA%20L090000880560&aggregateId=flal-l09000088056-b6d7afa2-3ff9-4b3b-9f4e-74c9f40cf469&searchTerm=DPN%20USA&listNameOrder=DPNUSA%20L090000880560 (last accessed Feb. 25, 2022).

registered agent the Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301.

31.    Shahriar "James" Ekbatani is a resident of Orange County, Florida. He was the primary founder of DPN/HealthFair and, at all relevant times, served as its Chief Executive Officer.

## V.    APPLICABLE LAWS
### A.    The False Claims Act

32.    The FCA makes it unlawful for any person to submit, directly or indirectly, false or fraudulent claims for payment to the Government. *See* 31 U.S.C. §§ 3729 *et seq.* Relator alleges liability primarily under four of the FCA's seven liability provisions.

33.    First, the FCA's "presentment" provision, 31 U.S.C. § 3729(a)(1)(A), imposes liability when a defendant (a) made, or caused to be made, a claim, (b) that was false or fraudulent, (c) knowing of its falsity.

34.    Second, the FCA's "false records or statements" provision, 31 U.S.C. § 3729(a)(1)(B), imposes liability when a defendant (a) made, used, or caused to be made or used, a record or statement, (b) that was knowingly false, and (c) that was material to a false or fraudulent claim.

35.    Third, the FCA's "reverse false claims" provision, 31 U.S.C. § 3729(a)(1)(G), imposes liability when a defendant (a) "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government" or (b) "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."

36.    Fourth, the FCA's "conspiracy" provision, 31 U.S.C. § 3729(a)(1)(C), imposes liability for conspiring to violate the FCA's presentment provision, the false records or statements provision, or the reverse false claims provision, discussed in the following paragraph.

37.    The "knowledge" element of the FCA is defined as (1) "actual knowledge of the [falsity of the] information"; (2) "deliberate ignorance of the truth or falsity of the information"; or (3) "reckless disregard of the truth or falsity of the information" used to obtain Government funds.  31 U.S.C. § 3729(b)(1).

9

38.    Under the FCA, the term "claim" means any request or demand for money, whether under a contract or otherwise, presented to an officer, employee, or agent of the United States. 31 U.S.C. § 3729(b)(2)(A)(i). A "claim" is also a request or demand for money made to a contractor or other recipient if (a) the money is to be spent or used on the Government's behalf or to advance a Government program or interest and (b) if the Government provides, has provided, or will reimburse such contractor or other recipient for any portion of the money requested or demanded. 31 U.S.C. § 3729(b)(2)(A)(ii).

39.    The FCA defines the term "obligation" to mean "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

40.    The FCA defines "material" using the objective standard of "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). The Supreme Court reaffirmed the natural tendency materiality test—even as to subsection (a)(1)(A), which does not explicitly use the term—and described a holistic approach to analyzing it. *See Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016).

41.    Defendants presented claims for payment to government healthcare programs that were "false or fraudulent" because they sought reimbursement for, *inter alia*: a) medically unnecessary tests that were driven, at least in part, by fraudulent standing orders; b) services not actually provided because the claims were upcoded to a higher level of service than actually provided; and c) medically unsupported diagnoses that fraudulently increased Medicare Part C risk adjustment scores resulting in higher capitated payments for the care of those beneficiaries. In addition, Defendants knew they had over-billed yet failed to self-disclose the misconduct to government healthcare programs or to refund the excessively billed and paid amounts.

42.    CMS requires the submission of accurate diagnosis codes that are properly

10

documented. Accurate diagnosis codes are fundamental to accurate payments from the Government to MAOs in the MA program. As the Court of Appeals for the District of Columbia recognized, "[p]ayments to the Medicare Advantage program depend on participating insurers accurately reporting to CMS their beneficiaries' salient demographic information and medically documented diagnosis codes." *UnitedHealthcare Ins. Co. v. Becerra*, No. 18-5326, 2021 U.S. App. LEXIS 24141, at *3 (D.C. Cir. Aug. 13, 2021).

43.    The United States has intervened in FCA cases and has pursued other enforcement actions involving fraudulent standing orders, as well as cases involving Medicare Part C risk adjustment fraud. *See United States ex rel. Bart Rossi v. Vericare*, Case No. 13-6884 (D. N.J.) (settling FCA allegations that Vericare sought and obtained standing orders and other agreements with 128 facilities under which Vericare's clinicians performed evaluations on all new admissions to the facility, regardless of whether such an evaluation was medically necessary); *United States ex rel. McGuire v. Millennium Laboratories, Inc.*, Case No. 12-cv-10132 (D. Mass.) (underscoring the DOJ's commitment to prosecuting FCA violations when Millennium agreed to pay  $256 million  to resolve  allegations that it billed for medically unnecessary urine drug and genetic testing,  in part  through  the promotion of "custom profiles" that were effectively standing orders that caused physicians to order a large number of tests without an individualized assessment of each patient's needs); and *United States ex rel. Swoben v. Secure Horizons, et al.*, Case No. 09-5013 (C.D. Cal.) (resolving its FCA liability, DaVita Medical Holdings LLC agreed to pay $270 million related to providing inaccurate information that caused MA plans to receive inflated Medicare payments).

44.    As another example, in July 2021, the United States intervened in six complaints alleging that members of the Kaiser Permanente consortium violated the FCA by submitting inaccurate diagnosis codes for its MA plan enrollees in order to receive higher reimbursements. Medicare requires that, for outpatient medical encounters, MA plans submit diagnoses to CMS only for conditions that required or affected patient care, treatment, or management during an in-

11

person encounter in the service year. The Government alleged that Kaiser, in order to increase its Medicare reimbursements, pressured its physicians to create addenda to medical records after the patient encounter, often months or over a year later, to add risk-adjusting diagnoses that patients did not actually have and/or were not actually considered or addressed during the encounter, in violation of Medicare requirements.[19]

45. In announcing the Government's intervention, Deputy Assistant Attorney General Sarah E. Harrington of the Justice Department's Civil Division stated: "Medicare's managed care program relies on the accuracy of information submitted by health care providers and plans to ensure that patients receive the appropriate level of care, and that plans receive the appropriate compensation. Today's action sends a clear message that we will hold health care providers and plans accountable if they seek to game the system by submitting false information."[20]

46. Acting United States Attorney Stephanie Hinds for the Northern District of California similarly stated: "The Medicare Advantage Program maintains the health of millions, and wrongful acts that defraud the program cannot continue and will be pursued."[21]

47. Acting United States Attorney Matt Kirsch for the District of Colorado similarly stated: "The federal government pays hundreds of billions of dollars every year to Medicare Advantage Plans. The District of Colorado will vigorously pursue investigations with our partners to make sure that money supports necessary health care, not fraud."[22]

48. By way of further example, in August 2021, Sutter Health, a California-based health care services provider, and several affiliated entities agreed to pay $90 million to resolve allegations that Sutter Health violated the FCA by knowingly submitting inaccurate information about the health status of beneficiaries enrolled in MA plans. More specifically, the Government alleged that Sutter Health knowingly submitted unsupported diagnosis codes for certain patient

---

[19] *See* https://www.justice.gov/opa/pr/government-intervenes-false-claims-act-lawsuits-against-kaiser-permanente-affiliates (last accessed Feb. 25, 2022).
[20] *Id.*
[21] *Id.*
[22] *Id.*

12

encounters for beneficiaries under its care. These unsupported diagnosis codes caused inflated payments to be made to the plans and to Sutter Health. The Government further alleged that, once Sutter Health became aware of these unsupported diagnosis codes, it failed to take sufficient corrective action to identify and delete additional unsupported diagnosis codes.[23]

49.     In announcing the settlement, Deputy Assistant Attorney General Sarah E. Harrington stated: "The government relies on health care providers, including those furnishing services to Medicare Part C beneficiaries, to submit accurate information to ensure proper payment. Today's result sends a clear message that we will hold health care providers responsible if they knowingly provide or fail to correct information that is untruthful."[24]

50.     By way of further example, in September 2021, the United States intervened and filed a complaint under the FCA against Independent Health Association, Independent Health Corporation (Independent Health), DxID LLC (DxID) and Betsy Gaffney, former CEO of DxID. The Government alleged that Independent Health, DxID, and Gaffney violated the FCA by submitting or causing the submission of inaccurate information about the health status of beneficiaries enrolled in MA plans in order to increase Independent Health's reimbursement.[25]

51.     The Government also alleged that DxID coded conditions that were not documented in the patient's medical record during a visit or encounter. The Government further alleged that DxID also asked health care providers to sign addenda forms up to a year after a visit or an encounter and subsequently used the addenda as substantiation for adding risk-adjusting diagnoses that were not documented during the patient encounter, in violation of Medicare requirements.[26]

52.     The Government further alleged that these unsupported diagnoses inflated the risk scores of beneficiaries, resulting in inflated payments to Independent Health and other MA plans,

---

[23] See https://www.justice.gov/opa/pr/sutter-health-and-affiliates-pay-90-million-settle-false-claims-act-allegations-mischarging (last visited Feb. 25, 2022).

[24] Id.

[25] See https://www.justice.gov/opa/pr/united-states-intervenes-and-files-complaint-false-claims-act-suit-against-health-insurer (last visited Feb. 25, 2022).

[26] Id.

and that once Independent Health became aware of these unsupported diagnosis codes, it failed to take corrective action to identify and delete the unsupported codes.[27]

53. In announcing the Government's intervention, Deputy Assistant Attorney General Michael D. Granston of the Justice Department's Civil Division stated: "The Medicare Advantage Program relies on accurate information about the health status of enrollees to ensure that they receive appropriate treatment and that participating health plans receive proper compensation for the services they actually provide. The department will continue to hold accountable health plans or providers that report unsupported diagnoses to inflate risk adjustment payments."[28]

54. These enforcement efforts demonstrate that Defendants' fraud is material for purposes of the FCA.

### B. Medicare
#### 1. Generally

55. Title XVIII of the Social Security Act ("Medicare") is a federally subsidized health insurance system for persons who are eligible based on age (over 65), disability, or affliction with end-stage renal disease. 42 U.S.C. §§ 426, 426-1, 426A.

56. HHS is responsible for the administration and supervision of the Medicare program. CMS is an agency of HHS and is directly responsible for the administration of the Medicare program.

57. CMS contracts with private companies, variously referred to as "fiscal intermediaries," "carriers," and Medicare Administrative Contractors ("MACs"), to act as agents in reviewing and paying claims submitted by health care providers. 42 U.S.C. §§ 1395h, 1395u; 42 C.F.R. §§ 421.3, 421.100, 421.104. Fiscal intermediaries, typically insurance companies, are responsible for processing and paying claims for reimbursement.

58. The cornerstone for Medicare and MA insurance coverage is medical necessity. Medicare excludes from coverage any expenses incurred for "items or services [that] are not

---

[27] Id.
[28] Id.

14

reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(l)(A); 42 C.F.R. § 411.15(k). Government healthcare programs also limit coverage to items that are "provided economically and only when, and to the extent, medically necessary . . ." 42 U.S.C. § 1320c-5(a)(1). Thus, providers are prohibited from submitting excessive claims or furnishing unreasonable, uneconomical, and unnecessary health services. *See* 42 C.F.R. § 1001.701 (permitting the exclusion of providers for violations).

59.    To seek reimbursement from Medicare and the other government healthcare programs described below, a health care provider must obtain an NPI number. The provider also must submit an enrollment application.

60.    Medicare is divided into four parts with separate coverage authorities: Medicare Part A (hospital insurance); Medicare Part B (medical insurance); Medicare Part C (Medicare Advantage); and Medicare Part D (prescription drug coverage). In this action, only Medicare Part B and Part C are relevant.

61.    Under all four parts of Medicare, the patient is responsible for paying certain deductibles and co-pay amounts. These amounts cannot be waived by a healthcare provider without a prior finding of need.

## 2.  Provider Certifications

62.    A provider must enroll in the Medicare program to receive Medicare reimbursement for covered services provided to eligible beneficiaries. To participate in the Medicare program, a provider must file a provider agreement with the Secretary of HHS ("the Secretary"). 42 U.S.C. § 1395cc. The provider agreement requires compliance with the requirements that the Secretary deems necessary for participation in the program. *Id.*; *see generally*, 42 C.F.R. §§ 489.1 *et seq*.

63.    Among other things, participating providers are prohibited from making false statements or representations of material facts concerning payment requests. 42 U.S.C. §§ 1320a-7b(a)(1) and (2); 42 U.S.C. § 1320a-7a(1); 42 C.F.R. § 1001.101(a). Providers are also required to know the information contained in HHS, CMS, and fiscal intermediary notices, including manual

15

issuances, bulletins, and other written guides and directives. 42 C.F.R. § 411.406.

64.    The enrollment application, CMS Form 855, includes a certification statement requiring the enrolling provider to certify the provider's adherence to a list of requirements, including, among others, the following:

    a.  Familiarity with and agreement to abide by applicable Medicare or other federal health care program laws, regulations, and program instructions, which are available through the Medicare Contractor.

    b.  Understanding that payment of a claim by Medicare or other federal health care programs is conditioned on the claim and the underlying transaction complying with such laws, regulations and program instructions (including the anti-kickback statute ("AKS") and the Stark law), and on a provider/supplier complying with any applicable conditions of participation in any federal health care program.

    c.  Agreement not to knowingly present or cause to be presented a false or fraudulent claim for payment by the Medicare or other federal health care programs and not to submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

65.    At all times material to this action, Defendants signed, or caused to be signed, one or more Medicare enrollment applications and/or entered into one or more Medicare provider agreements as described above.

66.    Defendants signed one or more enrollment applications (Form CMS 855B) certifying that "[m]y signature legally and financially binds this supplier to the laws, regulations, and program instructions of the Medicare program."

67.    By signing the Form 855B, Defendants also expressly agreed to abide by applicable Medicare laws, regulations, and program instructions, which they acknowledged are available through the Medicare contractor. Defendants also certified that they understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with

16

such laws, regulations, and program instructions (including, but not limited to, the AKS and the Stark law) and on their own compliance with all applicable conditions of participation in Medicare.

68.    Following enrollment, physicians and other health care providers who provide services to Medicare beneficiaries submit to the appropriate Medicare fiscal intermediary a claim for reimbursement through a CMS 1500. CMS regulations require that a provider's services and procedures must be entered onto a CMS 1500 by using procedure codes published by the American Medical Association, known as the Physicians' Current Procedural Terminology ("CPT"). 45 C.F.R. § 162.1002. Providers submit these claims for reimbursement by mail or electronically pursuant to an "Electronic Data Interchange (EDI) Enrollment Form" ("EDI Form") (and other documents) signed by the provider.

69.    At all times material to this action, Defendants submitted, or caused to be submitted, Forms CMS 1500 by one or both of these methods.

70.    Pursuant to the EDI Form, the provider, among other things, (a) certifies that it will submit claims that are accurate, complete, and truthful; (b) agrees that all claims are claims for payment under the Medicare program that will be paid from federal funds; and (c) agrees that falsifying or misrepresenting (or causing the falsification or misrepresentation of) any record or information relating to such claims violates applicable federal law.[29] In addition, the electronic claims themselves contain a certification of accuracy and veracity. At all relevant times, Defendants had entered into and were obligated by such an agreement.

71.    Medicare relies upon provider certifications in paying claims for services.

72.    A participating provider must properly document in the patient's medical record the service or procedure performed. 42 C.F.R. § 431.107(b)(1).

73.    Health care providers are prohibited from knowingly presenting or causing to be presented claims for items or services that the provider knew or should have known were not medically necessary or knew or should have known were false or fraudulent. 42 U.S.C. §§ 1320a-

---

[29]    *See*                                    https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/CMS10164B.pdf  (last visited Feb. 25, 2022).

7a(a)(1); 1320a-7(b)(7) (permitting exclusion of providers for the foregoing violations).

74.    A provider has a duty to familiarize itself with the statutes, regulations, and guidelines regarding coverage for the Medicare services it provides. *Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 64 (1984).

75.    Because it is not feasible for the Medicare program, or its contractors, to review medical records corresponding to each of the millions of claims for payment it receives from providers, the program relies on providers to comply with Medicare requirements and to submit truthful and accurate certifications and claims.

76.    Generally, once a provider submits a CMS 1500, or the electronic equivalent, to the Medicare program, the claim is paid directly to the provider, in reliance on the foregoing certifications, without any review of supporting documentation, including medical records.

77.    Using electronic and other means, Defendants routinely and knowingly submitted, or caused to be submitted, false or fraudulent claims to MA plans.

### 3.  Medicare Billing Procedures and Coding Terminology

78.    Proper billing and reimbursement require honest and accurate coding by the provider. Coding is the process by which a provider marks a "superbill" to reflect services rendered. This typically requires a provider to identify one or more billing codes that correspond to the treatment provided. Each code, or combination of codes, is tied to a specific fee that Medicare or a MA plan will pay the provider for the service rendered to the insured. In general, the more complex or extensive the service or test, the greater the compensation to the provider.

79.    Typically, an International Classification of Diseases ("ICD") code is assigned to a specific injury, disease, or encounter in the patient's chart by a provider or a coder. All issues and symptoms have a corresponding ICD code. From there, a biller translates the ICD code into CPT codes and submits the claim form to the insurance carrier for payment.

80.    Current Procedural Terminology ("CPT") coding was created by the American Medical Association ("AMA") and is the most widely utilized medical nomenclature. "Designated by the U.S. Department of Health and Human Services under the Health Insurance Portability and

Accountability Act (HIPAA) as a national coding set for physician and other health care professional services and procedures, CPT's evidence-based codes accurately encompass the full range of health care services."[30] A provider utilizes specific codes and submits them via a claim form to the third-party payor, such as Medicare.

81.   To obtain Medicare reimbursement for certain outpatient items or services, providers and suppliers submit a claim form known as the CMS 1500 form ("CMS 1500") or its electronic equivalent known as the 837P form. Among the information the provider or supplier includes on a CMS 1500 or 837P form are certain five-digit codes, including CPT codes and Healthcare Common Procedure Coding System ("HCPCS") Level II codes, that identify the services rendered and for which reimbursement is sought.

82.   The claim form must also include the unique billing identification number (NPI) of the "rendering provider" and the "referring provider or other source." If a medical assistant or a nurse practitioner provided the services, then the NPI number must be used to identify the "rendering provider," since Medicare pays for services by these types of providers at a lower rate than for the same services rendered by a physician.

83.   Medicare requires proper and complete documentation of the services rendered to beneficiaries. 42 U.S.C. § 1395l(e).

### 4.  Medicare Part B

84.   Medicare Part B is a voluntary subscription program of supplementary medical insurance covering outpatient care, including physician services and ancillary services. 42 U.S.C. § 1395k.

85.   Defendants billed some of the claims at issue in this case under Medicare Part B, which covers certain medical services that physicians and other providers and suppliers furnish. 42 U.S.C. § 1395k(a)(2)(B).

---

[30] American Medical Association, *CPT overview and code approval,*  available at https://www.ama-assn.org/practice-management/cpt/cpt-overview-and-code-approval  (last accessed Feb. 25, 2022).

86.    Typically, physicians are compensated for the services they provide Medicare patients on a fee-for-service basis as determined by Medicare's fee schedule. 42 U.S.C. § 1395w-4. To obtain compensation, physicians must deliver a compensable service, certify that the service was medically necessary for the health of the patient, certify that the physician (or someone under his or her immediate supervision) personally furnished the service, and determine the appropriate diagnosis and procedure code to describe the problem and service for billing.

87.    If the services were the result of a referral from another physician, each request for payment or each bill submitted for an item or service payable under Medicare Part B must include the name and unique physician identification number for the referring physician. 42 U.S.C. § 1395l(q)(1).

88.    Medicare only pays for Part B services that are actually rendered and are reasonable and medically necessary. 42 U.S.C. § 1395y(a). Part B providers also must certify that services are medically necessary. 42 C.F.R. § 424.24(g)(1).

### 5.  Medicare Part C (a/k/a Medicare Advantage) and the Risk Adjustment Model

89.    The Medicare Advantage Program (or Medicare Part C), Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395111, is a supplemental plan available to Medicare beneficiaries. Under the MA program, Medicare beneficiaries who are entitled to benefits under Part A and are enrolled under Part B may enroll in MA plans that are owned and operated by private Medicare Advantage Organizations ("MAOs"). WellCare, Optum, and Blue Cross Blue Shield are examples of MAOs with which CMS contracts and to which CMS pays a capitated amount for each beneficiary to provide or cover the cost of all Medicare-covered Part A and Part B benefits (except hospice) to those beneficiaries who enroll in their plan. CMS adjusts these capitated payments to MA plans based on demographic factors and on the health status of each plan beneficiary.

90.    To calculate payment amounts, CMS uses a health-based risk adjustment model – the Hierarchical Conditions Category ("HCC") model – that takes into account diagnoses from

inpatient hospital stays, outpatient encounters, and physician office visits as well as certain demographic factors. The diagnosis codes used in the model are grouped into HCCs, which are categories of clinically-related medical diagnoses.

91.    CMS assigns a relative numerical value to each HCC that correlates with predicted costs associated with treating conditions in the category. In general, the more severe the diagnosis or costly the associated treatment, the higher the risk score. CMS makes higher payments to the MA plan for beneficiaries with higher overall risk scores than for beneficiaries with lower overall risk scores.

92.    MAOs may contract directly with healthcare providers or they may contract with Medical Services Organizations ("MSOs"), which in turn either employ or contract with healthcare providers. The healthcare provider or MSO agrees to provide the healthcare services to the beneficiaries for the MAO. In exchange, the MAO agrees to pay the healthcare provider or MSO.

93.    Under MA, risk adjustment is generally based on the submission to CMS of the beneficiaries' health status or illnesses in the form of diagnosis codes. The diagnosis codes submitted for a beneficiary are reflected in a risk score. The risk-adjustment payment to a particular MA plan is the bid amount multiplied by the risk score for each enrollee. *See* 42 C.F.R. §422.308(e). In short, the higher the risk score for beneficiaries in its care, the higher the capitated payment from CMS for those beneficiaries.

94.    Here, MAOs contracted to receive services provided by DPN/HealthFair, and subsequently Matrix, through its mobile clinics. These services included mobile health assessments, advanced diagnostic testing, and additional care optimization services to thousands of MA beneficiaries under at least 10 MA plans, including, without limitation, WellCare, Optum, and Blue Cross Blue Shield. At DPN/HealthFair's peak in 2017, an average of 4,000 patients were seen on a monthly basis across the country.

95.    By creating standing orders that Dr. Oristaglio neither approved nor signed, ordering tests that lacked medical necessity, and providing test result "evaluations" by unqualified nurse

practitioners or computer programs, DPN/HealthFair and Matrix generated medically unsupported diagnoses, which in turn caused the risk scores of MA patients to be increased and resulted in the respective MA plans receiving higher reimbursements from the Government.

### C.    Laws Prohibiting Inducements to Beneficiaries or Providers
#### 1.    Beneficiary Inducements Statute

96.    The Beneficiary Inducements Statute prohibits "offers to or transfers [of] remuneration to any individual eligible for benefits under [Federal health care programs] that such person knows or should know is likely to influence such individual to order or receive from a particular provider, practitioner or supplier any item or service for which payment may be made, in whole or in part, under [federal health care programs]." 42 U.S.C. § 1320a-7a(a)(5); 42 C.F.R. § 1003.1000.

97.    The implementing regulations define "remuneration" to include "the waiver of copayment, coinsurance and deductible amounts (or any part thereof)" unless three conditions are met, including "a good faith effort to determine the individual is in financial need." 42 C.F.R. § 1003.102(b)(13) and 42 C.F.R. § 1003.101 at definition Remuneration, subpart (1) (eff. through Jan. 5, 2017); 42 C.F.R. § 1003.1000 and 42 C.F.R. § 1003.110 at definition Remuneration, subpart (1) (eff. Jan. 6, 2017).

98.    While some incentives may be "given to individuals to promote the delivery of preventive care services," the incentives may not include "[c]ash or instruments convertible to cash." 42 C.F.R. § 1003.101 (eff. through Jan. 5, 2017) and 42 C.F.R. § 1003.110 (eff. Jan. 6, 2017) at definition Remuneration, subpart (4)(i).

99.    As noted by the HHS Office of Inspector General:

Offering valuable gifts to beneficiaries to influence their choice of a Medicare or Medicaid provider raises quality and cost concerns. Providers may have an economic incentive to offset the additional costs attributable to the giveaway by providing unnecessary services or by substituting cheaper or lower quality services. The use of giveaways to attract business also favors large providers with greater financial resources for such activities, disadvantaging smaller providers and businesses.

22

*Special Advisory Bulletin: Offering Gifts and Other Inducements to Beneficiaries*, at 1 (HHS OIG Aug. 2002).[31]

100.  HHS OIG clarified that items of nominal value are exempted and interpreted that to mean a retail value of no more than $10 per item or $50 in the aggregate per patient per year. *Id.* at 4 (citing 65 FR 24400 at 24411 [Health Care Programs: Fraud and Abuse; Revised OIG Civil Money Penalties Resulting from Public Law 104-191(Apr. 26, 2000)]).

### 2. Anti-Kickback Statute

101.  The Medicare and Medicaid Patient Protection Act of 1987, also known as the federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), prohibits kickbacks in any "Federal health care program," defined as any program providing health benefits that is funded directly, in whole or in part by the United States Government, and any "State health care program." 42 U.S.C. § 1320a-7b(b)(2)(A) and (f). State health care programs include those approved under 42 U.S.C. §§ 1396 *et seq.* and child health plans approved under 42 U.S.C. §§ 1397aa *et seq.* They also include any programs receiving funds under or from an allotment to a State under 42 U.S.C. §§ 701 *et seq.* or 42 U.S.C. §§ 1396 *et seq.*

102.  The AKS applies to all federal health care programs, except the Federal Employee Health Benefits Plan. These include, among others, Medicare, Medicaid, TRICARE, Indian Health Services, and the Veterans Health Administration. All of these government-pay health care programs require every provider or supplier to ensure compliance with federal laws governing their services, including the AKS.

103.  Violation of the AKS can result in the imposition of criminal penalties. 42 U.S.C. § 1320a-7b(a) and b) (violation constitutes a felony, punishable by up to ten years in prison and/or a fine of $100,000).

104.  Since 2010, Congress has also removed any doubt as to the materiality of an AKS violation to liability under the FCA. The Patient Protection and Affordable Care Act ("PPACA")

---

[31] *See* https://oig.hhs.gov/documents/special-advisory-bulletins/886/SABGiftsandInducements.pdf (last visited Feb. 25, 2022).

specifically links violations of the AKS to the FCA. It amended the AKS to provide that "items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C. § 1320a-7b(g).

105.  The PPACA also amended the intent requirement to clarify that, just as with violations of the FCA, violations of the federal anti-kickback provisions may occur even if an individual does "not have actual knowledge" or "specific intent to commit a violation." 42 U.S.C. § 1320a-7b(h).

106.  The purpose of the AKS is to ensure that patient care is not compromised by improper influence from the health care industry. "[T]he federal anti-kickback law's main purpose is to protect patients and the federal health care programs from fraud and abuse by curtailing the corrupting influence of money on health care decisions." (OIG Fact Sheet, November 1999, Federal Anti-Kickback Law and Regulatory Safe Harbors.)[32]

107.  Under the AKS, it is illegal (a felony) to knowingly and willfully offer or pay "any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person" to induce that person "to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2). The AKS applies equally to any offer or payment made to either a beneficiary or to a healthcare provider.

108.  With respect to medical providers, the AKS provides certain "safe harbors" that allow medical providers to compensate physicians for activities that meet particular requirements. 42 U.S.C. § 1320a-7b(b)(3); 42 C.F.R. § 1001.952. In the present case, none of the safe harbors applies.

109.  Strict compliance with the "safe harbor" mandates is required. Many courts have held that, regardless of the appearance of compliance, the AKS is violated even if just one purpose of the conduct is to induce sales. *See, e.g.*, *United States v. Hong*, 938 F.3d 1040, 1048 (9th Cir.

---

[32] https://oig.hhs.gov/documents/compliance/851/safefs.htm (last visited Feb. 25, 2022).

2019); *Dhaliwal v. Salix Pharm., Ltd.*, 752 F. App'x 99, 100 (2d Cir. 2019); *Guilfoile v. Shields*, 913 F.3d 178, 189 (1st Cir. 2019).

### 3. The Stark Law

110. The Stark Law, 42 U.S.C. § 1395nn, is also known as the Physician Self-Referral Law. Implementing regulations are codified at 42 C.F.R. §§ 411.350 *et seq.* The Stark Law prohibits submission by an entity providing healthcare items or services of claims for payment to Medicare or Medicaid based on patient referrals from physicians having a "financial relationship" (as defined in the statute) with the referring entity.

111. The regulations implementing Stark expressly make it illegal for anyone to receive federal payment for a healthcare service that was performed "pursuant to a prohibited referral" and requires such person to "refund all collected amounts on a timely basis." 42 C.F.R. § 411.353.

112. Congress enacted the Stark Law in two parts, commonly known as Stark I and Stark II. Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992, by physicians with a prohibited financial relationship with the clinical lab provider. Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.

113. In 1993, Congress extended the Stark Law (Stark II) to referrals for ten additional designated health services ("DHS") effective January 1, 1995, including (1) inpatient and outpatient hospital services; (2) physical therapy; (3) occupational therapy; (4) radiology; (5) radiation therapy (services and supplies); (6) durable medical equipment and supplies, (7) parenteral and enteral nutrients, equipment, and supplies; (8) prosthetics, orthotics, and prosthetic devices and supplies; (9) outpatient prescription drugs; and (10) home health services. 42 U.S.C. § 1395nn(h)(6).

114. The Stark statute defines "referral" as "the request or establishment of a plan of care by a physician which includes the provision of the designated health service." 42 U.S.C. § 1395nn(h)(5)(B). The implementing regulations also define "referral" as, among other things, "a request by a physician that includes the provision of any designated health service for which payment may be made under Medicare. . . ." 42 C.F.R. § 411.351. A "referring physician" is

25

defined as "a physician who makes a referral as defined in this section or who directs another person or entity to make a referral or who controls referrals made to another person or entity." *Id.*

115. Stark expressly prohibits any entity from presenting or causing the presenting of any claim resulting from a referral from a physician who has a financial relationship with the entity, unless that relationship fits into one of the specific exceptions in the statute. For example, certain ownership interests in publicly-traded securities and in hospital entities are excepted. *See* 42 U.S.C. § 1395nn(d).

116. Any remuneration flowing between entities and physicians must be at fair market value for actual and necessary items furnished or services rendered based on an arms-length transaction and should not take into account, directly or indirectly, the value or volume of any past or future referrals or other business generated between the parties.

117. Whenever a physician receives compensation for services furnished to an entity pursuant to a bona fide employment arrangement with the entity, the physician is deemed to have a "financial relationship" with the entity under the Stark law in the form of a "compensation arrangement." An entity-employed medical director would maintain such a financial relationship regardless of the amount of compensation received or the manner in which it was calculated. 42 U.S.C. § 1395nn(h)(1); 42 C.F.R. §§ 411.354(a), 411.354(c).

118. Stark includes an exception protecting compensation to be paid pursuant to such employment arrangements. 42 U.S.C. § 1395nn(e)(2); 42 C.F.R. § 411.357(c). In order to qualify for protection under this exception, the arrangement must satisfy the following requirements:

   a. The employment must be for identifiable services but does not have to be memorialized.

   b. The amount of compensation paid to the physician must be consistent with fair market value of the services furnished and must not be determined in a manner that takes into account the volume or value of Medicare referrals generated by

the physician for the entity (excluding referrals for professional services personally performed by the referring physician).

c. The remuneration paid to the physician must be reasonable even if no Medicare referrals were made to the entity.

119. "The Stark Law is intended to prevent 'overutilization of services by physicians who [stand] to profit from referring patients to facilities or entities in which they have a financial interest.'" *United States ex. rel. Drakeford v. Tuomey*, 675 F.3d 394, 373 (4th Cir. 2012) (citation omitted). The Stark Law is a strict liability statute with no scienter requirement. Any amounts reimbursed by Medicare for services furnished in violation of the Stark Law must be repaid. 42 U.S.C. § 1395nn(g)(1); 42 C.F.R § 411.353(d); *Drakeford*, 675 F.3d at 397-98; *United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008) ("*Rogan II*").

120. Once the United States (or a relator suing on its behalf) has established the existence of a financial relationship and DHS referrals, defendants bear the burden of proving that the arrangements at issue meet all the requirements of an applicable exception to the statute. *United States ex rel. Kosenske v. Carlisle HMA, Inc.*, 554 F.3d 88, 95 (3d Cir. 2009); accord *Drakeford*, 675 F.3d at 405; *United States v. Rogan*, 459 F. Supp. 2d 692, 716 (N.D. Ill. 2006) ("*Rogan I*").

## VI.    DEFENDANTS' MISCONDUCT
### A.    HealthFair's Early Years

121. In about 1999, Defendant James Ekbatani founded the original HealthFair to provide mobile medical screening tests.

122. In 2000, Dr. Oristaglio responded to an advertisement, joined HealthFair as its Medical Director, and moved his family to the Orlando, Florida, area where HealthFair maintained its office. Dr. Oristaglio worked full-time for two years to help transform HealthFair into a viable mobile testing company.

123. Dr. Oristaglio was concerned with helping people in the early stages of cardiovascular disease ("CVD"), but who did not yet present outward symptoms supporting a clinical diagnosis

27

of CVD. Dr. Oristaglio believed these persons with subclinical CVD could be found early by using diagnostic tests to detect precursor conditions. These tests include: a) echocardiogram; b) electrocardiogram; c) carotid artery ultrasound; d) abdominal aortic aneurysm ultrasound; e) hardening of the arteries test; and f) peripheral arterial disease test.

124.  Dr. Oristaglio also believed that by administering these tests it would be possible to assign patients with a CVD "risk score" and to then risk-stratify patients to facilitate delivery of care coordination tailored to their risk strata. This became one of the core elements of HealthFair's business model.

125.  The early years, however, were marked by an unusual event that began in 2001. For a period of time, Defendant James Ekbatani was absent from the company but did not provide an explanation to Dr. Oristaglio. However, Dr. Oristaglio saw that Defendant Ekbatani's wife stepped in as the figurehead and tried to run the company, but it was clear she did not know what she was doing. Instead, Terrence Diaz, HealthFair's President, ran the company for over a year.

126.  Upon his return to the company in the fall of 2002, Defendant Ekbatani told Dr. Oristaglio that HealthFair was near bankruptcy and that it would not be able to keep Dr. Oristaglio as a full-time employee. As a result, Dr. Oristaglio moved back to Pennsylvania, but continued to perform services for HealthFair on a part-time basis pursuant to a series of contracts. These services included continuing as HealthFair's Chief Medical Officer for a monthly fee and reading echocardiogram and other test results for a per-unit fee.

127.  What Dr. Oristaglio now knows is that in 2002 Defendant James Ekbatani pled guilty to a felony charge and that CMS excluded him for a period of time, effective September 19, 2002[33] through March 31, 2013. Defendant Ekbatani concealed this information from Dr. Oristaglio. In fact, Dr. Oristaglio only learned this information after he was constructively discharged from Matrix in December 2019.

128.  Despite, or perhaps because of, Defendant Ekbatani's exclusion from CMS, HealthFair

---

[33] https://www.federalregister.gov/documents/2002/09/11/02-23033/program-exclusions-august-2002 (last accessed Feb. 25, 2022).

developed a business model of going direct to consumers (*e.g.*, patients) by offering diagnostics tests in a large mobile clinic, branded with HealthFair's logo, that made testing convenient and affordable. Corporate screening events were a significant segment of HealthFair's business.

129. Defendant Ekbatani remained the CEO of HealthFair until 2006, when he sold the company to Great Hill Partners. After the sale, Dr. Oristaglio continued as Medical Director of HealthFair.

**B.    DPN/HealthFair's Middle Years: Hospital Contracts and Corporate Events**

130. In the fall of 2009, while still subject to a CMS exclusion, Defendant Ekbatani formed DPN USA, LLC and used it to repurchase HealthFair. After the acquisition, Defendant Ekbatani called Dr. Oristaglio and asked him to continue as Medical Director of the new DPN USA, LLC d/b/a HealthFair ("DPN/HealthFair"). Dr. Oristaglio agreed to continue serving as Medical Director, which at that time remained a part-time position, while continuing to live in Pennsylvania.

131. By early 2011, DPN/HealthFair boasted 40 mobile units similar to the one shown below.[34]



132. The tests were marketed on HealthFair's website as preventive health screenings. With respect to CVD, HealthFair offered four testing packages, all of which included the following six core tests: a) echocardiogram; b) electrocardiogram; c) carotid artery ultrasound; d) abdominal aortic aneurysm ultrasound; e) hardening of the arteries test; and f) peripheral arterial disease test.

---

[34] https://www.prweb.com/releases/healthfair-mobile/health-screening/prweb8161166.htm (last accessed Feb. 25, 2022).

When only these six tests were performed, it was called the "Basic Package," and HealthFair charged about $179.00.

133. The patients selected the testing package they wanted and paid for it out-of-pocket.

134. During this time period, the mobile units were staffed by Medical Assistants ("MAs") and Cardiovascular Technicians ("CVTs") who performed the tests on the patients. The tests were then evaluated remotely by consulting physicians, like Dr. Oristaglio, who were contracted by DPN/HealthFair.

135. In recognition of Dr. Oristaglio's loyalty and contributions to building the company, in 2011 Defendant Ekbatani advised Dr. Oristaglio that he would receive a 1.833% equity interest in DPN/HealthFair. This equity, however, was not immediately issued to Dr. Oristaglio.

136. Shortly thereafter, in 2012, Dr. Oristaglio moved from Pennsylvania to Georgia to avail himself of a professional opportunity. Dr. Oristaglio, however, continued providing part-time services to DPN/HealthFair, including serving as its Medical Director.

137. By about 2012, DPN/HealthFair's model had caught the attention of hospitals, which saw it as an opportunity to provide better care for the communities they served.

138. Hospitals would contract with DPN/HealthFair to provide selected diagnostic services directly to persons in its service area.

139. From approximately 2012 until sometime in 2016, Doug Fellers, Director of Hospital Business Development, ran DPN/HealthFair's hospital business, although Defendant Ekbatani closely directed it and negotiated the contracts.

140. Mr. Feller would contact a hospital administrator and describe what DPN/HealthFair offered. If there was interest, Fellers would send information and set up an initial webinar at which he would present slides showcasing the company, the services it could provide, and its administrative and physician staff.

141. If the first webinar was successful, a follow-up webinar was arranged. During this second webinar, Mr. Fellers, Defendant Ekbatani, and a clinical provider would be on the

call/webinar answering questions about the buses and the locations. Consistent with his narrow focus on the clinical side of the business, Dr. Oristaglio played a limited role during this second webinar, answering only questions about the testing, protocols, reporting protocols, and the equipment that he had knowledge of. At no time was the cost of anything discussed during this second webinar or during any meetings at which Dr. Oristaglio was present.

142.   Defendant Ekbatani himself conducted separate meetings with the hospital to negotiate DPN/HealthFair's fees for each of the diagnostic tests to be offered, as well as fees for wrapping the mobile unit, and patient outreach to the targeted geographic areas.

143.   Some of the hospitals that DPN/HealthFair contracted with included Orlando Regional (Florida), Baylor College of Medicine (Texas), Thomas Jefferson University Hospitals (Pennsylvania), and Bon Secours (New York and New Jersey).

144.   As soon as a hospital contract was in place, DPN/HealthFair began marketing the outreach program via newspaper ads and direct mailings in the targeted zip codes. DPN/HealthFair then used its call center to do direct-dial outreach to patients in the targeted zip codes, field inquiries, and generally try to convince patients to make an appointment to get tested on the mobile units.

145.   Relator's understanding was that patients paid for the testing themselves.

146.   As Dr. Oristaglio understood these hospital-sponsored initiatives, there was no billing for the clinical visit component or the evaluations that the MAs and CVTs performed.

147.   As part of its contractual services, DPN/HealthFair's physicians evaluated all of the tests and provided written test results.

148.   The diagnostic test results were shared with the patient and, with the patient's informed consent, also with their primary care provider and the contracting hospital. The hospital's care coordinator would then reach out to the patient and facilitate a follow-up appointment with a primary care provider or specialist in the hospital's system.

149.   Dr. Oristaglio had hoped that these hospital outreach efforts would lead to population-

based clinical trials that would gather generalized data and lead to the development of care coordination, which was an emerging concept at the time.

150. Unfortunately, the hospital outreach program was derailed by a misguided outcry from the American College of Physicians and the consumer advocacy group Public Citizen. These groups engaged in fearmongering assertions that early diagnosis of CVD's pre-cursor conditions could result in more harm than benefit. For example, in mid-2014, Public Citizen sent twenty hospitals a 20-page letter-memorandum requesting that they terminate their partnerships with DPN/HealthFair on the grounds that it could result in patient harm.[35] In 2015, the American College of Cardiology expressed similar concerns that mobile screenings were resulting in subsequent unnecessary testing.

151. As a result of these negative publicity campaigns, the hospitals eventually stopped using DPN/HealthFair's mobile clinics to conduct patient outreach in their service areas. By 2016, DPN/HealthFair's hospital outreach contracts were winding down.

### C.    DPN/HealthFair's Shift into Medicare Advantage Fraud

152. Looping back to the latter half of 2012, and with less than a year left of his CMS exclusion, Defendant Ekbatani began laying the groundwork for expanding DPN/HealthFair into the MA market.

153. First, in late 2012 Defendant Ekbatani began courting Dr. Oristaglio to move back to Florida and work full-time for DPN/HealthFair as the National Director of Medical Affairs. Dr. Oristaglio initially resisted the offers, but the overtures became more intense the following year, which Dr. Oristaglio now knows corresponded with the April 1, 2013, expiration of Defendant Ekbatani's CMS exclusion.

154. Second, in mid-2013, Defendant Ekbatani approached Dr. Oristaglio, who was still living and working in Georgia, and explained that DPN/HealthFair's attorneys had advised him that the best way to expand the company would be to set up several professional corporations in

---

[35] *See* https://www.citizen.org/article/letters-to-twenty-hospitals-and-medical-institutions-asking-them-to-end-their-partnerships-with-healthfair/ (last accessed Feb. 25, 2022).

other states under the names of a few of DPN/HealthFair's key physicians, such as Dr. Oristaglio. Defendant Ekbatani also explained that DPN/HealthFair would act as the professional corporations' management company handling all of the details and that all Dr. Oristaglio had to do was sign some documents as part of the initial formation of the professional corporations.

155.  Wanting to help DPN/HealthFair grow, Dr. Oristaglio agreed to be the incorporator of the following three professional corporations:

| Name | State of Incorporation | Date of Incorporation |
|---|---|---|
| HealthFair Plus PA (with the registered fictitious name: HealthFair) | Arkansas | June 26, 2013 |
| HealthFair Plus NJ PC | New Jersey | April 23, 2014 |
| HealthFair Plus DE PA | Delaware | N/A |

156.  Dr. Oristaglio later learned that the following professional entities were formed in the name of Justin Hung Pham, M.D:

| Name | State of Incorporation | Date of Incorporation |
|---|---|---|
| HealthFair Plus PC | California | July 15, 2013 |
| HealthFair Plus LLC | Ohio | July 16, 2013 |
| HealthFair Plus PC/ HealthFair Plus AL PC (name changed June 2, 2017) | Alabama | July 17, 2013 |
| HealthFair Plus PC (expired) / HealthFair Plus OK PC (inactive) (date of name change unavailable) | Oklahoma | Oct. 8, 2013 |

157.  Dr. Oristaglio also later learned that the following professional corporation was formed in the name of Frank Geoffrey Toonder, M.D:

| Name | State of Incorporation | Date of Incorporation |
|---|---|---|
| HealthFair Plus CS, P.C. | South Carolina | Aug. 24, 2016 |

158.  Each of these professional corporations is also registered to do business in multiple other states, including states where one of the other entities was formed. Through these complex layers of entities all doing business under the name "HealthFair Plus," Defendant Ekbatani and

33

DPN d/b/a HealthFair was able to obscure from MA plans exactly which entity they were contracting with and to conceal the fact that services would ultimately be rendered by an entity owned and controlled by a felon who pled guilty to committing Medicare fraud.

159.  After the formation of the three professional corporations in his name, Dr. Oristaglio never received any stock certificates showing his alleged 100% ownership interest in these entities. Moreover, Dr. Oristaglio never received any information whatsoever from Defendants Ekbatani or DPN about the activities of these entities. In particular, and without limitation, Dr. Oristaglio never received a shareholder earnings statement, tax form, dividend check, financial statement, or a balance sheet. In short, Dr. Oristaglio was unwittingly used as the front man to set up entities that Defendant Ekbatani completely and secretly operated.

160.  After being constructively discharged from Matrix in 2019, and in the course of other litigation, Dr. Oristaglio learned that Defendant Ekbatani and DPN/HealthFair used the eight physician-owned professional corporations, which Frazier and Providence learned through the due diligence process, as the actual entities that entered into mobile testing service contracts with MA plans so that Ekbatani could obfuscate his felony guilty plea, as well as his resulting prison sentence and 10-year CMS exclusion.

161.  Under this scheme, the MA plans entered into contracts with one of the professional corporations, which then paid DPN to provide all of the testing services to the MA plan beneficiaries.

162.  Furthermore, the professional corporations paid DPN a "management fee" for all of its services to "operate" these sham companies. DPN's tax return for 2016 shows that $15 million of its $20 million in revenue came from "management fees" paid by the professional corporations.

163.  When Matrix purchased the assets of DPN/HealthFair, it included the eight professional corporations discussed above, which were inconsistently referenced as "subsidiaries" while at the same time stating that they were 100% owned, respectively, by the three physicians. Regardless, as part of the sale to Matrix, Dr. Oristaglio never signed any documents redeeming or

transferring his ownership, if any ever existed, in any of the three entities, and he was not compensated for his alleged 100% ownership interest in those entities.

164. In late 2013, while Defendant Ekbatani was putting these professional corporations in place, he also began positioning the company for future sale.

165. As part of his efforts, Defendant Ekbatani courted Relator to move to Orlando, Florida, and join DPN/HealthFair on a full-time basis as its Chief Medical Officer. Relator eventually accepted the offer and signed an Agreement with DPN/HealthFair to work full-time starting January 1, 2014. Dr. Oristaglio also moved his family back to the Orlando, Florida, area.

166. DPN/HealthFair's Agreement with Relator incentivized his future loyalty by including a right to a 1.5% equity share in DPN/HealthFair, although it was denoted as "Reserve Units" that would only vest, or be redeemable and yield a financial benefit to Relator, if Relator was still working for DPN/HealthFair at the time it was acquired by another company, which the Agreement predicted would occur within 3-5 years.

167. Despite being DPN/HealthFair's full-time Chief Medical Officer, Dr. Oristaglio never received a copy of DPN/HealthFair's Operating Agreements, never had access to the complete electronic health records of patients, and was routinely left off of correspondence and left out of meetings. In short, Defendant Ekbatani retained tight control of DPN/HealthFair.

168. DPN/HealthFair entered into a similar agreement with Dr. Toonder to incentivize him to help build the company into an acquisition target.

169. In about mid- to late 2014, and despite having already started setting up the HealthFair Plus professional corporations, Defendant Ekbatani explained to Dr. Oristaglio how he "recently" came up with the idea of targeting MA plans as clients.

170. Defendant Ekbatani explained that he had learned from physicians who were contracted by an MA plan that they were having difficulty fulfilling MA's directives to annually evaluate a specified number of patients to update their diagnoses and provide preventive screenings. They also explained how those services impacted the patient's risk score—which ultimately affected the

capitated rate CMS paid for the patient. The physicians further explained that there were certain diagnoses in which the MA plan was particularly interested, including atrial fibrillation, peripheral artery disease, CVD, and chronic obstructive pulmonary disease ("COPD"), since these would result in higher "risk scores." The physicians also noted that completing the requisite number of annual patient evaluations and patient updates had a positive impact on the MA plan's star rating given by CMS.

171. Defendant Ekbatani's basic concept was to enter into contracts with MA plans to provide one of three types of visits covered by MA (e.g., Welcome to Medicare visit, Annual Wellness visit, or Annual Routine Physical visit) and to perform screening tests during those visits. This pro-active, preventive dimension of care under Medicare Part C had been part of the 2010 Affordable Care Act, which also changed the name of the program to Medicare Advantage. In order to encourage patients to come in for these annual visits, no co-pay could be charged and numerous preventive screenings were covered.[36]

172. Beginning in late 2014, Defendant James Ekbatani placed his son, Ray Ekbatani, in charge of developing DPN/HealthFair's new business model focused on contracting with MA plans. In that role, Ray Ekbatani conducted initial research about the Medicare Part C program and presented it during internal DPN/HealthFair meetings.

173. Early in the development process, Ray Ekbatani mentioned star ratings and risk scores, which were concepts unique to MA plans that Dr. Oristaglio was unfamiliar with. After the two concepts were explained to Oristaglio, Defendant James Ekbatani outlined how DPN/HealthFair's new business model would involve contracts with MA plans to provide services that would align with an MA plan's objectives of increasing star ratings to attract enrollees and/or to increase patient risk scores in order to increase the payments the plan would receive from CMS.

---

[36] *See, e.g.*, United Healthcare's *2022 Medicare Advantage preventive screening guidelines: Frequently asked questions*, at 5 (available at https://www.uhcprovider.com/content/dam/provider/docs/public/health-plans/medicare/MA-Preventive-Services-Coding-Guidelines.pdf (last accessed Feb. 25, 2022).

36

174. The MA program's star ratings for MA plans are based, in part, on the adequacy of delivering services listed on the Healthcare Effectiveness Data and Information Set ("HEDIS"). Patient risk scores, on the other hand, are driven by diagnoses that impact their placement into the many HCCs.

175. In order to properly deliver the services its new MA plan customers desired, DPN/HealthFair purchased Vatica software for use by its newly hired Nurse Practitioners ("NPs") who would primarily be staffing the mobile clinics. Vatica Health Inc. holds itself out as providing risk adjustment and quality of care coding services for providers of Annual Wellness Visits under MA.[37] Importantly, Vatica's "D" screen includes the HCC M.E.A.T. [Monitoring, Evaluation, Assessment, Treatment] section where diagnoses are coded and validated. NPs accessed the Vatica software, including its "D" screen, in the mobile units. The software also guided the user on the various steps, or flow, of an encounter with an MA patient.

176. As with the hospital contracts, Ray Ekbatani eventually spearheaded reaching out to MA plans to describe DPN/HealthFair's new program. If there was interest, Ray Ekbatani, Defendant James Ekbatani, and Tamilyn Vandenheuvel (Field Operations Supervisor / Clinical Director), would then meet with the MA plan representatives to discuss the diseases and healthcare conditions the MA plan wanted to focus on, as well as objectives pertaining to both HEDIS and risk adjustment. Ray, James, and Tamilyn would then translate the MA plan's desires into a tailor-made program that included the tests DPN/HealthFair would offer and perform and the MA Plan's requirements for reporting the test results in a manner that would facilitate clinical diagnoses.

177. Defendant Ekbatani, Ray Ekbantani and others would also negotiate the contract terms, including the fees to be paid to DPN/HealthFair for each test performed.

178. Once the MA plans signed the contract, the DPN/HealthFair call center was used to contact MA plan enrollees to schedule appointments. In most instances, the MA beneficiaries were offered a $40 gift card from CVS Pharmacy or a similar retailer to induce them to schedule their

---

[37] *See* https://vaticahealth.com/ (last accessed Feb. 25, 2022).

annual visit and preventive screenings at a DPN/HealthFair mobile unit. This practice continued even after Matrix acquired the company.

179.  Dr. Oristaglio was never involved in any facet of the contracting negotiations and other business processes. Instead, he remained focused on determining what types of additional testing could feasibly be provided in the mobile units that would meet the needs of MA plan clients.

180.  Dr. Oristaglio had some involvement during these internal DPN/HealthFair discussions to provide information relevant to these new tests. For example, DPN/HealthFair's President and COO, Terry Diaz, asked Dr. Oristaglio to provide the relevant billing codes and corresponding payment rates for all of the tests that would be offered. Dr. Oristaglio fulfilled the request by providing Terry Diaz, James Ekbatani, and Ray Ekbatani with information from official publications, such as the American Society of Echocardiography Coding and Reimbursement Newsletter. Terry, James, and Ray later used this information to negotiate fees with MA plans.

181.  In the fall of 2014, Defendant Ekbetani complained that the Vatica software was too expensive and asked Dr. Oristaglio to work with Tamilyn to develop efficient patient intake protocols, including how to assess patients to determine which test, if any, was medically necessary. Dr. Oristaglio was tasked with establishing clinical policies and procedures and then training NPs on how to conduct the patient visits.

182.  In response, Dr. Oristaglio created protocols to ensure that NPs would appreciate what documentation and symptoms were required to substantiate medical necessity for a variety of tests, primarily related to cardiac and peripheral vascular diseases. He wrote policies and procedures and trained the lower level medical practitioners (i.e., NPs and CVTs who worked in the mobile units.

183.  To effectuate his approach, Dr. Oristaglio first took account of the fact that DPN/HealthFair's mobile units are staffed with NPs who are recent graduates, are only qualified in general medicine, must practice under the supervision of a licensed physician, and are not qualified to justify the medical necessity of a test for a patient whose history and clinical indications fall into a gray area. Therefore, Dr. Oristaglio researched and developed evaluation

protocols, indications for each particular test, and training designed to ensure that NPs would only order tests for patients when it was indisputable that the tests were medically indicated.

184. In about September and October 2014, Dr. Oristaglio prepared a spreadsheet of relevant questions to ask patients with respect to three broad areas of concern: cardiac history and symptoms; peripheral artery disease/peripheral vascular disease history and symptoms; and cerebrovascular disease. A positive response to each question was correlated, in the next two columns, with a differential diagnosis (*e.g.*, a list of possible causes) and a list of recommended tests.

185. Dr. Oristaglio called these protocols "clinical pathways." This name intentionally reflected the nature of the protocols as being research-based, medically-supported clinical guidelines for identifying which indications would support clear medical necessity to order a specific test.

186. In October 2014, Dr. Oristaglio created an internal-use Power Point, entitled "HEALTHFAIR: Health Risk Assessment and Clinical Pathways Program," briefly describing the approach. The approach started with an expanded health questionnaire covering: medical, surgical, family, and social histories; percutaneous interventions; medications; and habits. It then progressed to an expanded review of systems, including cardiac, cerebrovascular, peripheral arterial, peripheral venous, pulmonary (including COPD and sleep apnea), and cancer. The next step was to establish differential diagnoses (*e.g.*, a list of possible causes) based upon the information gathered from the first two steps. The next step was to establish "recommended tests," consistent with current medical evidence as well as based upon the patient's history, symptoms, and results of previous tests.

187. Dr. Oristaglio knew that Terry and Tamilyn used his protocols to create a flow chart for actual use by NPs to guide their evaluation of MA patients in the mobile units. Dr. Oristaglio was also aware that Shawn Ekbatani, DPN/HealthFair's Information Technology Director, used Dr. Oristaglio's clinical pathways spreadsheet when working with a software development

39

company to write a new program to use instead of Vatica for the MA patients. In fact, Dr. Oristaglio reviewed Beta versions of the software, called Penguin, which Shawn developed under the banner of his own company called HIPLINQ LLC (which Matrix also acquired in December 2019).

188.    Eventually, DPN/HealthFair offered the following 13 tests that were reviewed, interpreted, and electronically signed by a contract physician, including Dr. Oristaglio:

    a.  Lipids (fingertip blood sample)
    b.  A1C (fingertip blood sample)
    c.  Blood Pressure
    d.  Echocardiogram
    e.  ECG a/k/a EKG [electrocardiogram]
    f.  Abdominal aortic ("AA") ultrasound: imaging and Doppler
    g.  LEAD (focused lower extremity arterial Duplex imaging and Doppler for blood flow)
    h.  Spirometry
    i.  ABI/Flowcheck/Quantiflo (specific test determined by MA plan client)
    j.  DPN [Diabetic Peripheral Neuropathy]
    k.  DRS [Diabetic Retinal Scan]
    l.  Mammogram (only with select contracts)

189.    Since Dr. Oristaglio's patient evaluation protocol was designed to result in the ordering of a test only when it was clearly medically indicated, NPs established the clinical diagnoses after the contracted physician interpreted all of the test results.

190.    In order to sharpen NPs' ability to properly establish clinical diagnoses, Tamilyn coordinated twice-monthly clinical review conference calls and required all NPs to attend at least one call per month. During these calls, Dr. Oristaglio and George Dow, a senior NP, selected and reviewed clinical cases from DPN/HealthFair's EHR system[38] (including the evaluation data and test results), discussed the proper diagnosis, and answered questions. These clinical reviews stopped, however, when George Dow left DPN/HealthFair in about 2017 because Defendant Ekbatani failed to abide by his promise to issue him equity reserve units in the company.

191.    After the NP had established the diagnoses and electronically signed the patient record,

---

[38] DPN/HealthFair's EHR system was a propriety system that Dr. Oristaglio, Tamilyn, and the software vendor Taaza, Inc., developed.

HealthFair's billing coders would then assign a billing code to the diagnoses.

192.    At some point during the development of the new MA business model, Defendant Ekbatani appointed Dr. Oristaglio as the Lab Director of DPN/HealthFair. However, there was never a signed contract documenting Dr. Oristaglio's position as Lab Director, even though he was technically the owner of three HealthFair Plus professional corporations that were set up for the sole purpose of steering lab business to DPN/HealthFair.

193.    Despite his best efforts to implement a model driven by a patient's medical needs and sound medical practice in a setting where NPs were doing the face-to-face encounter with the patients, over time it became clear that DPN/HealthFair had veered away from evidence-based medicine and, instead, focused on increasing MA patient risk scores to benefit its MA plan clients and on increasing the volume of tests to increase its own revenue.

194.    For example, by 2015 DPN/HealthFair routinely generated monthly reports analyzing the work it had performed under its MA plan contracts, which reports focused on DPN/HealthFair's effectiveness at increasing risk scores. These reports included an "HCC Analysis" and an "AWV [Annual Wellness Visit] HCC risk detail."

195.    Significantly, in November 2015, Defendant Ekbatani requested a "purely ROI lift analysis" with respect to patients served under the Optum Utah contract, which he wanted in order to provide him with leverage to negotiate an extension of the contract. Dr. Oristaglio asked to see the "HCC risk lift list" and also expressed his frustration that the focus was on increasing HCC risk scores, or "risk lift" as it was commonly called, rather than on evidence-based patient care.

196.    In addition to focus on "risk lift," Defendant Ekbatani became increasingly focused on generating revenue to make DPN/HealthFair's revenue appealing to potential suitors. Defendant Ekbatani and Tamilyn directed NPs, and even certain employees in DPN/HealthFair's back office, to order more tests simply to enhance revenue. This was especially true with respect to the tests that generated the highest fees for DPN/HealthFair, such as echocardiograms.

197.    What Dr. Oristaglio did not learn until years later, however, is that Terry and Tamilyn

41

later changed the flow charts into documents, entitled "Standing Orders," and affixed a copy of Dr. Oristaglio's signature to the documents without Dr. Oristaglio's knowledge—let alone his approval.

198.  Dr. Oristaglio first learned of the existence of Standing Orders when he asked questions about medical records arriving in his queue for review, but which did not include tests requiring interpretation.[39] This occurred in 2017, which is also when Defendant Ekbatani was strongly pushing to find a buyer for DPN/HealthFair and was strongly pushing to increase the volume of tests. What caught Dr. Oristaglio's attention was that he began receiving patient charts in his review queue that did not contain any test results needing interpretation, such as echocardiograms, so he simply clicked "next" and moved on. Dr. Oristaglio asked Tamilyn why this was happening, to which she responded that these patients simply received blood tests or other simple tests that were part of "Standing Orders." Dr. Oristaglio was shocked by this revelation.

199.  Because standing orders are often abused, they are not—in and of themselves— usually acceptable documentation that tests are reasonable and necessary. Accordingly, the insurer may reject standing orders as evidence that a test is reasonable and necessary. Medicare contractors may require additional documentation to support the medical necessity of the test. As a result of the potential problems standing orders may cause, the use of standing orders is discouraged.[40]

200.  Moreover, standing orders are only permissible in certain circumstances in hospitals or skilled nursing facility settings in relation to an extended course of treatment. Here, however, the mobile health clinics do not constitute a setting for an extended course of treatment. Mobile health assessments, advanced diagnostic testing, and additional care optimization services are based on an individual's needs at a specific point in time.

---

[39] As background, the lab test data from all of DPN/HealthFair's mobile units was uploaded to a central medical records department, which then assigned the records for review by physicians contracted by DPN/HealthFair. Even though Dr. Oristaglio was the full-time Chief Medical Officer, he was also one of the physicians who reviewed test data. This is done by electronically accessing and reading the data, writing an interpreting, and then affixing the physician's e-signature.

[40] 63 Fed. Reg. 45076, 45081 (Aug. 24, 1998).

201. The following are examples of the Standing Orders DPN/HealthFair prepared that contain Dr. Oristaglio's unauthorized signature:

| Document | Explanation |
| --- | --- |
| 2018 Martin's Point Standing Orders (NOTE: 2 revision dates - 04/10/18 and 08/08/17) | Standing Order that Dr. Oristaglio did not create, authorize, or sign. Still, his signature appears on page 5. |
| Commercial Standing Order dated 4/10/18. | Standing Order that Dr. Oristaglio did not create, authorize, or sign. Still, his signature appears on page 4. |
| Field Standing Order (Medicare) dated 4/10/18 | Standing Order that Dr. Oristaglio did not create, authorize, or sign. Still, his signature appears on page 4. |
| Optum NV Medicare Standing Orders dated 4/10/18. | Standing Order that Dr. Oristaglio did not create, authorize, or sign. Still, his signature appears on page 6. |
| United  Field Standing Orders (Medicare) dated 5/2/12018. 1 NP Model.[41] | Standing Order that Dr. Oristaglio did not create, authorize, or sign. Still, his signature appears on page 5. |

202. These sample Standing Orders show that DPN/HealthFair used Dr. Oristaglio's signature without his authorization or knowledge to create an illicit scheme for ordering tests without first determining medical necessity. Moreover, the titles of these Standing Orders indicate that they were not only used for MA plan clients, but also for commercial clients such as clinics.

203. A further implication of these standing orders containing Dr. Oristaglio's unauthorized signature is that Dr. Oristaglio's NPI number was used to bill for the NPs' evaluations of patients and ordering of tests.

204. Federal law requires that: "All orders, including verbal orders, must be dated, timed, and authenticated promptly by the ordering practitioner or by another practitioner who is responsible for the care of the patient only if such a practitioner is acting in accordance with State law, including scope-of-practice laws, hospital policies, and medical staff bylaws, rules, and regulations." 42 C.F.R. § 482.24(c)(2). In addition, "[f]or medical review purposes, Medicare requires that services provided/ordered be authenticated by the author . . . . Stamped signatures are

---

[41] Attached as Exhibit B.

not acceptable." Medicare Program Integrity Manual § 3.3.2.4.

205. DPN/HealthFair created the Standing Orders before the February 16, 2018, sale to Matrix. Subsequently, Matrix revised the various standing orders after its acquisition of DPN/HealthFair.

206. Even after Matrix purchased DPN/HealthFair, this business unit remained under the direction of Defendant Ekbatani. As a result, Matrix continued the foregoing practice of ordering medically unnecessary tests.

207. In addition, Matrix—again under the direction of Defendant Ekbatani—usurped the medical judgment of the contracted physicians. In particular, Defendants only used the contract physicians to interpret the ECG, echocardiogram, AA, and LEAD tests and shifted the nine other tests to interpretation by inaccurate computer programs or NPs who are unqualified to interpret tests. Furthermore, even when the NP's license in a particular state required a collaborative agreement with a physician, the collaborating physician was not given access to the patient's chart for a final review.

208. Not only did this approach fall far below the standard of care, it resulted in routine problems with inaccurate test interpretations. This is because proper test interpretation requires integration of the clinical information by a qualified physician. Dr. Oristaglio complained about these processes and the resulting inaccuracies on numerous occasions.

209. For example, on April 8, 2019, Dr. Oristaglio emailed Dr. Castillo concerning Patient 2597344, event 56893, stating:

> It gets to my points of clinical concern. While the ECGs are reviewed by the docs; as I previously mentioned, having tests which are not straightforward to perform or interpret not reviewed by our physicians creates clinical issues. These tests are not amenable to computer interpretation, which frequently are wrong, and then only NP overread. I am very uncomfortable about that from the clinical quality of care perspective.

210. As another example, on April 15, 2019, Dr. Oristaglio emailed Chris Bevan and Roger E. Nasiff, Ph.D. concerning Patient 1802551, event 56902, calling to their attention "ECG: the computer diagnosis A Fib but it clearly is sinus and is normal! Please review."

44

211. In short, with the contract physicians largely out of the picture, Defendants Ekbatani and Matrix were free to paper patient files in a manner that worked backward from desired diagnoses designed to create "risk lift" for MA plan clients. In other words, Defendants Ekbatani and Matrix interpreted tests in a manner that supported a desired diagnosis, rather than upon the medical evidence.

**D. Defendants Retaliated against Dr. Oristaglio and Constructively Discharged Him for Raising Concerns about Fraud and Poor Patient Care**

212. At all relevant times, Dr. Oristaglio was an employee, contractor, and/or agent of Matrix, and by extension, of the former company HealthFair and its DPN subsidiaries ("Matrix/HealthFair").

213. Dr. Oristaglio was constructively terminated from his employment and/or other relationships with Matrix/HealthFair effective December 31, 2019, as a result of, *inter alia*: a) Defendants' creation of "Standing Orders" containing Dr. Oristaglio's unauthorized signature that were used by NPs and others to justify ordering medically unnecessary tests for patients; b) Defendants' actions that effectively deprived Dr. Oristaglio of the powers necessary to discharge his duties as Chief Medical Officer and Laboratory Director of Matrix; and c) Defendants' refusal to correct and bring up to the requisite standard of care the various clinical care issues that Dr. Oristaglio had repeatedly raised.

214. As to this final point, Dr. Oristaglio not only raised the issues illustrated in the prior paragraphs, but also other quality of care and service issues as illustrated in the paragraphs below.

215. For example, in a March 29, 2019, email to Daniel Castillo regarding Patient 2594849, event 56892, Dr. Oristaglio wrote:

> Please look into this. I did ask Julianne but I am not quite satisfied with her answer. The ECG and the CHAT are the concerns. The ECG shows AF. Julianne claims the NP initialed the ECG but I see no initials or any tech notes to acknowledge the AF [atrial fibrillation], nor could I find any history or reference in CHAT to a past history of AF, yet she states she found it. I have asked to to [sic] show me where that is in CHAT and also where the NP supposedly initialed the ECG .... Had additional info from Julianne. She sent an image of the ECG that did indeed have a note from the NP. Unfortunately, there is a disconnect here. The only thing available to me was an ECG with no NP notes and no tech notes: nothing. This must be fixed. I have repeatedly tried to get

45

Matrix to make sure all ECGs have been signed off by the NP prior to the patient leaving the bus and to make that info available to the Docs, for situations exactly like this one.

216. As another example, in a July 22, 2019, email to Julianne Bellavance and Daniel Castillo concerning Patient 57145's charting compliance and care, Dr. Oristaglio indicated that "I hope you investigate why I see charts that are weeks behind! I only now received the above event from June 22! That is not acceptable and never was at HF!" Admitting to problems, Ms. Bellavance responded that "[i]t is not acceptable, but unfortunately there were and have been a series of issues that senior leadership is aware of and we are working through the back log as quickly as possible. We did have some issues with HF as well when we were dealing with charting compliance issues last summer that created a back log. I am not justifying or stating this is acceptable, but it is a multifactorial and as an organization, we are working through these issues as quickly as possible."

217. These email exchanges underscore two critical items: (1) both senior management and the nurse practitioners at Health Fair and Matrix had knowledge and control of the process that excluded Dr. Oristaglio and Dr. Toonder and resulted in false claims being submitted to government healthcare programs; (2) tests were being ordered without a finding of medical necessity; and (3) Dr. Oristaglio was getting items to review after claims were submitted.

218. Dr. Oristaglio's reports of illegal and fraudulent conduct and his efforts to stop that conduct fell on deaf ears. Instead, and among other things, Matrix/HealthFair knowingly created and maintained a work environment that was predictably threatening and harassing to Dr. Oristaglio. This is because Dr. Oristaglio had always made it clear that quality of patient care was his priority, and both Matrix/HealthFair and Dr. Oristaglio knew that any complicitly in illegal, fraudulent conduct put Dr. Oristaglio's integrity as a physician, medical licenses and professional reputation at risk.

219. Matrix/Healthfair thereby effectively forced him to terminate his relationship with Matrix/Healthfair as an employee, contractor and/or agent to protect his integrity, medical licenses and reputation.

220. Because Dr. Oristaglio could not allow his integrity, medical licenses and

professional reputation to be placed at risk by such practices, he reasonably felt he had no choice but to resign and/or otherwise terminate his relationships with Matrix/HealthFair.

## COUNT I
## False Claims Act
## 31 U.S.C. § 3729(a)(l)(A)
## (False or Fraudulent Claims)

221. Relator realleges and incorporates by reference Paragraphs 1- 220.

222. By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, materially false or fraudulent claims for payment or approval—including, without limitation, claims tainted by kickbacks/inducements to Medicare beneficiaries, claims for services that were not medically necessary, claims for services not rendered, and claims for services that were not performed by the provider corresponding to the NPI on the claim—all in violation of 31 U.S.C. § 3729(a)(1)(A).

223. Knowingly presenting or causing to present a materially false or fraudulent claim for payment or approval renders Defendants liable for statutory penalties, pursuant to 31 U.S.C. § 3729(a), in an amount to be determined at trial.

224. Furthermore, had the Government actually known of the false or fraudulent nature of the claims, it would have been prohibited by law from making the corresponding payments.

225. The Government, however, was unaware of the false or fraudulent nature of the claims Defendant presented or caused to be presented.

226. Because of the materially false or fraudulent claims Defendants presented or caused to be presented, the Government paid the corresponding claims.

227. As a result, the Government suffered actual damages in an amount to be determined at trial, and for which Defendants are liable to pay treble actual damages pursuant to 31 U.S.C. § 3729(a).

47

## COUNT II
### False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)
### (False Records or Statements)

228. Relator realleges and incorporates by reference Paragraphs 1- 220.

229. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims submitted or caused to be submitted for payment or approval—including, without limitation, records or statements which misrepresented and/or concealed the fact that claims were tainted by kickbacks/inducements to Medicare beneficiaries, claims for services were not medically necessary, claims for services were not rendered, and claims for services were not performed by the provider corresponding to the NPI on the claim—all in violation of 31 U.S.C. § 3729(a)(1)(B).

230. Knowingly making, using, or causing to be made or used, false records or statements material to false or fraudulent claims submitted or caused to be submitted for payment or approval renders Defendants liable for statutory penalties, pursuant to 31 U.S.C. § 3729(a), in an amount to be determined at trial.

231. Had the Government actually known of the false or fraudulent nature of the records or statements, it would have been prohibited by law from making corresponding payments.

232. The Government, however, was unaware of the false nature of the records or statements.

233. Because of the falsity of the records or statements, which were material to false or fraudulent claims submitted for payment or approval, the Government has been damaged in an amount to be determined at trial.

234. As a result, the United States suffered actual damages in an amount to be determined at trial, and for which Defendants are liable to pay treble actual damages pursuant to 31 U.S.C. § 3729(a).

48

## COUNT III
## False Claims Act
## 31 U.S.C. § 3729(a)(1)(G)
## ("Reverse" False Claims)

235.  Relator re-alleges and incorporates by reference paragraphs 1 - 220.

236.  As detailed above, Defendants knowingly made, used, and/or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, and/or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, in violation of 31 U.S.C. § 3729(a)(1)(G).

237.  As a result of Defendants' actions, the Government has been, and may continue to be, severely damaged in an amount to be determined at trial.

## COUNT IV
## False Claims Act
## 31 U.S.C. § 3729(a)(1)(C)
## (Conspiracy)

238.  Relator re-alleges and incorporates by reference paragraphs 1 – 220.

239.  As detailed above, Defendants conspired to engage in conduct that violated the violated the False Claims Act as set forth Counts I – III above, and engaged in acts in furtherance of said conspiracy.

240.  As a result of Defendants' actions, the Government has been, and may continue to be, severely damaged in an amount to be determined at trial.

## COUNT V
## False Claims Act
## 31 U.S.C. § 3730(h)
## (Retaliation)

241.  Relator re-alleges and incorporates by reference paragraphs 1 - 220.

242.  Dr. Oristaglio was unlawfully threatened, harassed, and terminated from his relationship with HealthFair/Matrix as an employee, contractor, and/or agent of HealthFair/Matrix

49

in retaliation for lawful acts done by him on behalf of the Government and the general public in furtherance of an action under this section, as well as his efforts to stop one or more violations of the FCA. Defendants violated 31 U.S.C. § 3730(h) when they retaliated against Plaintiff for exercising his rights and engaging in protected action under the FCA, leaving him no reasonable choice but to resign and/or terminate his independent contractor or other relationship with HealthFair/Matrix

243. As a direct result of Defendants' unlawful retaliatory conduct, Plaintiff has experienced damages for which he is entitled to relief under 31 U.S.C. § 3730(h).

## PRAYER FOR RELIEF

WHEREFORE, Relator/Plaintiff, on behalf of himself and the Government, respectfully prays as follows:

1. That for violations of the FCA, 31 U.S.C. §§ 3729, *et seq.*, this Court enter Judgment against Defendants in an amount equal to three times the amount of damages the Government has sustained because of Defendant' actions, plus the maximum civil penalties allowed by law for each and every action in violation of 31 U.S.C. §§ 3729, *et seq.*;

2. That Relator be awarded the maximum relator's share of the treble damages, penalties, or other financial benefit awarded to the Government, pursuant to 31 U.S.C. § 3730(d);

3. That for violations of 31 U.S.C. § 3730(h), Plaintiff be awarded, as appropriate, double back pay or its equivalent, plus interest, front pay, and any other compensatory/special damages (including litigation costs and reasonable attorneys' fees).

4. That the Court enter Judgment against Defendant and for Relator in the full amount of Relator's reasonable costs and expenses of this action, including all reasonable attorneys' fees, pursuant to 31 U.S.C. § 3730(d); and

5. That the Government and Relator-Plaintiff receive all relief, both in law and equity, to which they reasonably are entitled.

## REQUEST FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff/Relator demands a trial by jury of all issues so triable.

Respectfully submitted,

**RACHEL V. ROSE – ATTORNEY AT LAW, PLLC**

Dated: February 25, 2022

/s/ Rachel Veronica Rose, Esq.

Rachel Veronica Rose, Esq.
TX License 24074982
EDTX - ADMITTED
P.O. Box 22718
Houston, TX 77227
T: (713) 907-7442
rvrose@rvrose.com

### HALUNEN LAW

#### *Pro Hac Vice Forthcoming*

Lon R. Leavitt, Esq.
AZ Bar No. 35825
One Renaissance Tower
Two North Central Avenue
Suite 1800
Phoenix, AZ 85004
T: (602) 254-6494
F: (612) 605-4099
leavitt@halunenlaw.com

Gerald C. Robinson, Esq.
MN Bar No. 0212787
80 South 8th Street, Suite 1650
Minneapolis, MN 55402
T: (612) 605-4098
F: (612) 605-4099
robinson@halunenlaw.com

*Attorneys for Qui Tam Plaintiff/Relator*
*Robert P. Oristaglio, D.O.*

51

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 25th day of February, 2022, I caused a true and correct copy of the foregoing Complaint to be sent via United States certified mail, return receipt requested, to:

Merrick Garland
United States Attorney General
Department of Justice
950 Pennsylvania Ave, N.W.
Washington, D.C. 20530

Brit Featherston
United States Attorney for the Eastern District of Texas
101 East Park Blvd., Suite 500
Plano, Texas 75074

James Gillingham
Civil Chief, U.S. Attorney's Office for the Eastern District of Texas
101 East Park Blvd., Suite 500
Plano, Texas 75074

/s/ Rachel V. Rose, Esq.
 Rachel V. Rose